WR-82,467-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/8/2015 4:52:11 PM
Accepted 12/9/2015 8:01:17 AM
ABEL ACOSTA
CLERK

IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF TEXAS
AUSTIN, TEXAS

2015 DEC -8 PM 4: 25

RECEIVED
COURT OF CRIMINAL APPEALS
12/9/2015
ABEL ACOSTA, CLERK

EX PARTE §
§
§ NO. WR-82,467-01
§
STANLEY ORSON MOZEE §

CAUSE NO. F99-02631-R
WRIT NO. W99-02631-R(A)

EX PARTE § IN THE DISTRICT COURT
§
§ 265TH JUDICIAL DISTRICT
§
STANLEY ORSON MOZEE § DALLAS COUNTY, TEXAS

## APPLICANT STANLEY MOZEE'S OBJECTIONS TO TRIAL COURT'S SUPPLEMENTAL FINDINGS OF FACT IN RESPONSE TO REMAND ORDER

TO THE HONORABLE JUDGES OF SAID COURT:

NOW COMES STANLEY ORSON MOZEE, Applicant herein, and

submits these Objections to the Trial Court's Supplemental Findings of Fact In

Response to Remand Order, and would show the following:

## INTRODUCTION

While it is not uncommon for a writ applicant to allege a *Brady* violation,

the due process claims brought by Mr. Mozee and his co-defendant, Dennis Allen,

are unusual and well-founded. There is no dispute among any of the numerous attorneys and judges who have reviewed the record – including the former trial prosecutor himself – that a wealth of *Brady/Giglio* material regarding at least two criminal informant witnesses (as well as several eyewitnesses) was not heard by the juries that convicted either Applicant of capital murder. Nor is there any dispute that (1) the *Brady* material was known to the prosecutor well prior to trial, and (2) if it was not disclosed, and/or if the informants testified falsely about these matters, both Applicants are entitled to relief. In addition, this is a case in which the State has already agreed, based on the extensive record, that new trials should be granted to both Applicants, and the district court reached a similar conclusion in detailed, written findings entered over one year ago.

This writ comes back to this Court after a remand hearing before a newly-assigned district judge, the Hon. Teresa Hawthorne (at which it emerged that Judge Hawthorne has known the trial prosecutor, Rick Jackson, for over twenty-five years). After the hearing, and without waiting for the reporter's record, Judge Hawthorne summarily entered findings that Mr. Jackson was "credible" in his personal belief that he must have turned over the core *Brady* material in question to Mr. Mozee, which consisted of two letters written to the prosecutor by the lead informant in his case, Zane Smith. However, the trial prosecutor actually admitted at the hearing that he (1) had no recollection of

actually turning over the letters to Mr. Mozee's counsel, (2) found no notes or other documentation in any way indicating that he did so, and (3) did not disclose at least one of these two letters, which specifically discussed the benefits that Smith had been promised by the State in exchange for his testimony.

The district court's Findings are clearly not supported by the record, because they made no mention of these and other key concessions by former ADA Jackson. Were that not enough, there are numerous other reasons why Judge Hawthorne's view that Mr. Jackson was "credible" in his personal belief (but not his factual recollection, as he admitted he had none) that he likely complied with *Brady* is not supported by the record. These include that the court failed to consider substantial, unrebutted evidence in the record that the trial prosecutor (1) repeatedly violated what he claimed were his own practices regarding informant testimony when it came to this case, (2) admitted that he failed to correct false informant testimony at the Allen trial, and (3) committed numerous other *Brady* violations in the course of prosecuting both defendants, by failing to disclose exculpatory information that his own file notes confirm was known to him. Such evidence is particularly significant where, as here, the former prosecutor admits that he has no recollection nor documentation as to his compliance with *Brady* in this case, but simply believes that he did not violate the law, whether intentionally or inadvertently. Yet the district court inexplicably failed to consider any of it.

This Court has repeatedly declined to adopt a trial court's findings under art. 11.07 if they are not supported by the objective record. Here, the record not only does not support Judge Hawthorne's cursory factual findings— it strongly supports the detailed Findings of Fact and Law entered by the district judge who had earlier presided over these writs. Indeed, as discussed *infra*, the correctness of the former district judge's findings recommending *Brady* relief were only strengthened by the additional testimony and documentary evidence presented on remand.

## PROCEDURAL HISTORY

Applicants Stanley Mozee and Dennis Allen were convicted the robbery-murder of the Rev. Jesse Borns, Jr. – a Dallas shopkeeper who was stabbed to death in April 1999 -- at separate trials in August and September, 2000. Both Applicants maintained their innocence of the murder at trial, and continue to do so.

No forensic evidence or eyewitnesses connected either defendant to the crime. Instead, the State relied on a highly problematic "confession" by Mr. Mozee, who suffered from a history of mental illness (and whose diagnoses had been confirmed by County and State officials). The "confession" was written out for him to sign by a lone detective, contained no information that was not already known to police, and was inconsistent with much of what police did know to be true about the murder and the crime scene. Indeed, Mr. Mozee's "confession"

bore numerous features common to other, proven false confessions, as reflected in both social scientific research and case studies of the more than 25% of post-conviction DNA exonerations to date that involved false confessions.[1]

The remainder of the State's case against both Applicants rested on uncorroborated claims made by a series of jailhouse informants and other witnesses with criminal records and/or pending charges. At Mr. Mozee's trial, a single jailhouse informant (Zane Smith) testified; he claimed that Mr. Mozee had confessed the murder to him while at the County Jail. The State relied heavily on Smith's alleged "corroboration" for Mr. Mozee's custodial confession, as well as his claim that Mr. Mozee was faking symptoms of mental illness as part of his defense. At the time Smith made these allegations, he was incarcerated at the County Jail, facing up to 20 years in prison on pending theft charges as a prior felony offender; however, three weeks before he testified against Mr. Mozee, he was given a highly favorable plea and sentence in which he received only 365 days State Jail time. Smith also testified at Mr. Allen's trial, along with a veritable parade of similarly dubious (and uncorroborated) criminal informants, who each claimed to have overheard Mr. Allen admit to the crime or otherwise claimed that

---

[1] *See, e.g.,* Applicants' Joint Memorandum of Law in Support of Applications for Writs of Habeas Corpus, filed Sept. 11, 2014, at 14-17 (discussing Mr. Mozee's false confession, including its lack of corroboration/conflicts with other known case facts); Writ hearing Exhs. 4-6 (scholarly articles and studies regarding false confessions, including DNA exoneration cases); Innocence Project, *False Confessions and Admissions,* available at http://www.innocenceproject.org/causes-wrongful-conviction/false-confessions-or-admissions (discussing data and underlying causes of false confessions in DNA exoneration cases).

they could establish some link between Mr. Allen and the murder victim.

On September 11, 2014, both Mr. Mozee and Mr. Allen filed Applications for Writs of Habeas Corpus under Tex. Code Crim. Proc. art. 11.07 and 11.073. The writs and their accompanying Joint Memorandum of Law represented the culmination of a multi-year investigation into Applicants' claims of innocence, conducted by their counsel at the Innocence Project and Innocence Project of Texas, with the cooperation of the then-Dallas County District Attorney, Craig Watkins. The writ raised multiple grounds for habeas relief, including DNA-based claims of actual innocence, and a claim that new scientific evidence would have likely resulted in acquittal had it been available at trial (citing the results of state-of-the-art DNA testing conducted by the parties over several years). *See* Joint Memorandum of Law filed 9/11/15, at 64-84.

In addition, both Applicants presented new evidence that the former trial prosecutor had violated their rights to due process by (1) withholding numerous items of exculpatory evidence regarding testifying jailhouse informants, and (2) knowingly eliciting and/or failing to correct false testimony given by at least two of those informants, as well as by the lead detective in the case. *See id.* at 85-108 (discussing claims for relief under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959). These claims were based primarily upon contemporaneous correspondence from two of the informants – Zane Smith and

Lonel Hardeman – that expressly discussed the benefits that the trial prosecutor had promised to give them, and/or that they were demanding from the State, in exchange for their testimony, but which directly impeached what the jury had been told about the trial prosecutor's communications with these witnesses. *See id.* These materials were in the prosecutor's trial file, but were only disclosed to the defendants as part of the Dallas County District Attorney's "open file" policy, which was not in effect at the time Applicants were convicted.

In light of all the evidence developed and reviewed during the parties' respective investigations, the District Attorney concluded in October 2014 that both Applicants were, at the very least, clearly entitled to *Brady* relief, and that the case was of such a nature that both Applicants should be released on personal bond pending this Court's review of the record. (They were released on October 28, 2014 and, thanks in part to their family and community ties, have fully complied with all terms and conditions of bond. Due to his medical needs, Mr. Mozee has lived primarily in a supportive housing community in Dallas, while Mr. Allen has resided with his extended family in the Dallas County area.)

Specifically, Judge Stolz found it "readily apparent" from the documentary record that that the trial prosecutor had failed to disclose the State's extensive correspondence with informants Smith and Hardeman regarding the benefits they sought and/or expected to receive from the State, in violation of *Brady* as well as

the trial judge's written discovery orders. The court held that the trial prosecutor had further suppressed "the substantive discussions with the informants that underlies this correspondence," and had failed to correct false testimony by these informants about the matters reflected in their letters. The court proceeded to find that these violations were material, in that they "undermine[d] confidence in the verdict[s]" against both Applicants, and required relief under *Brady* and related authorities. The parties and the trial court further agreed to defer any action on Applicants' remaining grounds for relief.

On February 4, 2015, this Court issued identical remand orders in both Applicants' cases, instructing the trial court to further develop the factual record regarding both Applicants' *Brady* claims. Specifically, this Court ordered the trial court to "provide the trial prosecutor with the opportunity to respond" to the *Brady* allegations. The trial court was further ordered to issue supplemental findings of fact and conclusions of law regarding "the response, if any, of the trial prosecutor."

Upon receiving the remand order, the Judge of the 265th Judicial District Court, Judge Jennifer Bennett, recused herself from hearing this case (Judge Bennett had previously served as a felony prosecutor in the same District Attorney's Office as Rick Jackson, the former lead prosecutor in both the Allen and Mozee cases). The original findings in this case were made by Judge Mark

Stoltz, who was at that time Judge of the 265th Judicial District Court, but who left office at the end of 2014.

Following Judge Bennett's voluntary recusal, Judge Teresa Hawthorne of the 203rd Judicial District Court was assigned to preside over the cases. Judge Hawthorne did not work in the Dallas District Attorney's Office with Mr. Jackson. However, it was revealed at the hearing that she and Mr. Jackson had known one another for twenty-five years (indeed, Mr. Jackson reminded Judge Hawthorne of that fact, and addressed the judge by her first name, while on the record) (RR.I.:46). The State was also represented by a new District Attorney, with former Judge Susan Hawk having replaced former District Attorney Watkins as Dallas County District Attorney as of January, 2015, and ADA Patricia Cummings replacing Russell Wilson as the Chief of the Conviction Integrity Unit.

On October 26-27, 2015, Judge Hawthorne held an evidentiary hearing pursuant to this Court's remand order. The focus of the hearing was former ADA Jackson's testimony. At the time of the hearing, Mr. Jackson had "retired" from the practice of law. (R.I: 10.) After leaving the Dallas District Attorney's Office in 2007, he briefly worked as a defense attorney, and then was hired as an assistant prosecutor in Denton. (*Id.* at 11.) He left Denton County in 2013 due to what he characterized as a "[m]utual disagreement with my boss." (*Id.*) When asked to explain what that disagreement was, Mr. Jackson stated, "It had nothing to

do with anything except his desire for me to be weak on crime and my desire to prosecute cases fully." (*Id.* at 12.)

As discussed in greater detail *infra* (and in the accompanying Objections filed herewith by Mr. Allen) Mr. Jackson candidly admitted that he had no recollection whatsoever regarding whether or not he provided the correspondence from these informants to either Applicant's trial counsel. He did not deny that all of the letters were *Brady/Giglio* material; he simply maintained that, because it would have been his practice to make timely disclosure of exculpatory information, he presumes he did so in the Mozee and Allen cases.

Mr. Jackson agreed that he was given a full and fair opportunity to review his trial file weeks before the hearing (which included extensive handwritten notes that he himself prepared, during and prior to trial, including detailed notations regarding discovery he had shown or given to counsel). He was also provided his own copy of a CD with the entire reporter's record from both trials. (R.R.II: 124-26, 146.) Mr. Jackson's practice was to keep well-organized and meticulous documentation of his work on a case, including what was provided to defense counsel in discovery, and he was known to be extremely thorough in his documentation. (R.R.I: 109-10).

During his file review, however, Mr. Jackson admitted that he found no specific mention of any of the informants' letters in any of the detailed lists he

made about what he showed or provided to defense counsel. Instead, he found one -- and only one -- indication in the entire record that, he claimed, supported his belief that he must have given this correspondence to either defendant's counsel prior to trial. (*Id.* at 127, R.R.I: 106-08, 113.) That notation consisted of a single entry in his personal notes from the first day of Mr. Allen's trial (which took place <u>after</u> Mr. Mozee was already convicted), documenting that Mr. Jackson had "show[n]" Mr. Allen's counsel, James Oatman, the "knife and rest of physical evidence." (*Id.* at 108.) This entry, Mr. Jackson maintained, was proof in his mind that he had shown Mr. Oatman the <u>documentary</u> evidence to which the defense was entitled under *Brady* and *Giglio*. He was cross-examined at length about the well-understood difference between "physical evidence" and documentary evidence, as well as the fact that he himself made a <u>separate</u> list of the documents he showed or gave to Mr. Oatman in the Allen case, which notably did not include the informants' letters. (*Id.* at 108-09, 113; R.R. II: 132.) Mr. Jackson further testified that he presumed (though on this point, he had no notes to even arguably confirm his assumption) that he did the same for Mr. Mozee's counsel. (R.R.II: 52-53.)

Finally, Mr. Jackson testified at length about what he maintained were his consistent and wholly lawful practices when dealing with informants, under which, he maintained, (1) he would "never" provide assistance to any informant with his

or her own criminal matter until after the informant testified and Mr. Jackson was satisfied with the testimony, and (2) he would not have any specific discussion as to actual or even "potential" benefits the State might provide to an informant until after he or she testified. (*See, e.g.,* R.R.I: 33-34, R.R.II: 42-43, 62-64, 86.) And he claimed that he followed these practices with respect to each and every informant who testified for him at the Mozee or Allen trials. (*Id.*; R.R.I: 36-37.)

At the conclusion of the hearing, both Applicants indicated that they would amend their writs in response to new information supporting their *Brady* claims that had been presented at the hearing (including through the trial prosecutor's own testimony and notes), as well as additional issues and potential claims for relief that emerged at the hearing. Counsel for both Applicants and the State informed the district court that they anticipated the need for further testimony and/or development of the record to address these issues. (R.II: 166-67.) The court asked if the parties were ready to set another date "to continue the hearing." Applicants' counsel indicated that they would prefer to confer with the State and get back to the court with a proposed date, and the court agreed. (*Id.* at 167.)

On November 15, 2015, both Applicants filed Amended Applications for Writs of Habeas Corpus.[2] In their amended writs, they alleged that new

---

[2]Due to an editing error in the original Amended Writ, which resulted in one of the grounds for relief exceeding the maximum page limitations, Mr. Mozee filed a corrected copy of his Amended Writ on November 18, 2015.

documentary evidence and testimony revealed that the trial prosecutor had committed still further *Brady* violations with respect to other informant witnesses as well as eyewitnesses, similar to (but separate from) the violations regarding informants Smith and Hardeman that were the principal focus of the remand hearing. (They also alleged, in the alternative, that if the trial prosecutor was somehow correct in his assumption that he had disclosed any of what everyone agreed was *Brady* material to defense counsel at trial, then trial counsel were ineffective for failing to present that evidence to the jury.)

On November 10, 2015, without waiting for the parties to schedule additional hearing dates, nor for the record of the October 26-27 hearing to be prepared, Judge Hawthorne issued Findings of Fact on remand. The court did not disturb or challenge Judge Stoltz's Findings of Fact and Conclusions of Law regarding the significance or materiality of the informants' correspondence, or Mr. Jackson's underlying discussions with these informants, under *Brady*. The court also did not disturb (nor address) Applicants' claims that ADA Jackson had knowingly failed to correct false testimony from both informants at trial, which Judge Stoltz had found to be supported by the record and the applicable caselaw. Instead, in an extremely cursory fashion, the court made a general finding that Mr. Jackson was "credible," and proceeded to enter the following Findings of Fact:

> The court finds that Mr. Jackson testified that he did not violate *Brady v. Maryland* in this cause.

The court finds that Mr. Jackson had no specific recall of handling the jail house letters from the informants to defense counsel. The Court, however, finds that while Mr. Jackson had no specific recall of handing over the letters, his meticulous trial notes indicate that he turned over all of the physical evidence to defense counsel. The Court finds that Mr. Jackson was convinced that he would have included the jailhouse letters as part of the physical evidence handed over to defense counsel.

The Court finds that Mr. Jackson's testimony and his notes support that he turned over the jailhouse letters to defense counsel.

Notably, the court entered identical Findings as to both Applicants, even though, by the trial prosecutor's own admission, the "meticulous notes" relied upon were prepared on the first day of the Allen trial -- which took place one month after Mr. Mozee was convicted, and thus had nothing to do with any discovery the prosecutor may have provided to Mr. Mozee.

These Objections follow.

## STANDARD OF REVIEW

As "the ultimate fact-finder" on any writ application, this Court has made clear that it will only defer to a trial court's findings if they are supported by the record as a whole. *See, e.g., Ex parte Navarijo*, 433 S.W.3d 558, 567 (Tex. Crim. App. 2014). That is so even where, as here, the trial court's findings are based primarily on its evaluation of a witness's credibility or demeanor. *See, e.g., id.* at 568-69 (declining to adopt district court's finding that complainant's recantation

was credible, in light of other record evidence undermining her hearing testimony); *see also Ex parte Harleston*, 431 S.W.3d 67 (Tex. Crim. App. 2014) (same); *Ex Parte Flores*, 387 S.W.3d 326 (Tex. Crim. App. 2012) (declining to defer to trial court findings where court did not address or resolve significant factual issues in dispute).

Here, there are even less compelling grounds for deference to Judge Hawthorne's findings as to ADA Jackson's purported credibility, because Mr. Jackson was not able to recall – and thus could not testify regarding -- whether he actually complied with *Brady*. Instead, the only factual matters upon which Mr. Jackson was able to testify were what he claimed were his standard practices when using criminal informants (which Judge Hawthorne did not address), and his personal belief that he must have followed those practices (and thus, complied with *Brady*) in this case.

As for the substantive law governing Applicant's claims, this Court has emphasized that he need not prove that the trial prosecutor deliberately suppressed favorable evidence, since "the good or bad faith of the state is irrelevant for due process purposes." *Thomas v. State,* 841 S.W.2d 399, 402 (Tex. Crim. App. 1992) (en banc). Furthermore, where the record shows that exculpatory evidence – including evidence impeaching the credibility of a State's witness – was not disclosed, for whatever reason, an applicant need not prove that

disclosure would necessarily have resulted in his acquittal. Instead, he is entitled to habeas relief if the State's failure to disclose *Brady* material "undermine[s] confidence in the verdict." *Id.* at 405; *see also Smith v. Cain*, 132 S.Ct. 627 (2012). And where a prosecutor fails to correct testimony that he knew to be false or misleading, an even more generous standard applies, and relief shall be granted if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 153-54 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

## ARGUMENT

I.    **The District Court's Findings that the *Brady* Letters by Informant Zane Smith Were Turned Over to Mr. Mozee Are Not Supported by the Record Because – by the Trial Prosecutor's Own Account – Any Disclosure of the Letters Did Not Occur Until the Start of Co-Defendant Allen's Trial, Which Was One Month After Mr. Mozee Was Already Convicted**

Mr. Mozee's first Objection to the district court's findings is as simple as it is unassailable. Judge Hawthorne's findings regarding Mr. Mozee are clearly not supported by the record, because – in entering identical, verbatim Findings as to both Applicants -- the only portion of the testimony and exhibits that she relied upon to find that former ADA Jackson "turned over the jailhouse letters to defense counsel" have nothing whatsoever to do with Mr. Mozee's trial nor any disclosures made to his lawyer. Instead, they

relate solely to the prosecutor's recollection and notes regarding the Allen trial, which occurred one month after Mr. Mozee was already convicted.

This is plain error even if this Court were to fully accept the trial prosecutor's testimony as to what he believes he provided to the defense by way of discovery in either Mozee's or Allen's case, including his own interpretation of his file notes. This is because, by former ADA Jackson's own admission, the "trial notes" cited by the district court in its Findings were prepared by Jackson on the first day of Mr. Allen's trial (August 28, 2000) and relate only to the discovery he gave to Mr. Allen's lawyer on that date. By that time, Mr. Mozee was already convicted, as his trial concluded on August 1, 2000. Thus, the trial prosecutor's notes and alleged recollection as to the discovery he claims he provided – which was the only evidence or testimony that the district court relied upon in finding that the informant letters were disclosed to either counsel – reveal absolutely nothing about whether Jackson had complied with his *Brady* obligations towards Mr. Mozee.

As noted *supra*, Mr. Jackson candidly admitted that he had no recollection of turning over any of the jailhouse informant letters to either defendant's counsel. (R.R.I:95-96.) However, he conceded that all of the letters in question were *Brady/Giglio* material, and were further subject to

mandatory disclosure under the express terms of certain pretrial orders entered in this case. (R.R.I:94, R.R.II:76.) He also admitted that there was no indication anywhere in the Reporter's Record that either defense attorney had the letters, or knew about them, when they cross-examined these informants. (R.R.I:96.) Upon reviewing his own extensive trial file, including his "meticulous notes," Mr. Jackson found just one entry that he claimed was corroboration for his "belief" that he disclosed the letters to either defense counsel. (R.R.II:127, 136.) This was the notation dated 8/28/00, in which Jackson wrote – under the header "Show Oatman" – "knife and rest of physical evidence." (R.R.I:113.) James Oatman was Mr. Allen's lawyer, but did not represent Mr. Mozee.

According to Jackson, this "physical evidence" notation is "proof" that on the first day of Mr. Allen's trial, he "show[ed] Oatman" not just tangible items of property like the knife, the decedent's clothing, etc., but also any and all documentary evidence – including all of the informants' letters – that constituted *Brady* material. (R.R.I: 106-107, R.R.II:127, 132.) It was this notation, and Jackson's testimony regarding it, that was the only factual basis for Judge Hawthorne's finding that "he turned over the letters to defense counsel," in identical Findings she entered for both Applicants.

Even assuming *arguendo* that this Court were to find that the record

supports Judge Hawthorne's conclusion that the informant letters were included among the "physical evidence" made available to Mr. Allen (which, for the reasons cogently stated in Mr. Allen's Objections, it does not), by Mr. Jackson's own admission, the evidence relied upon by the district court <u>does not apply to Mr. Mozee's writ</u>. For Mr. Jackson admitted at the hearing that (1) the notation in question was made on the first day at Allen's trial, and described discovery he provided at the Allen trial only, (2) in his extensive search of his trial file, <u>he found no corresponding notes regarding any discovery he provided to</u> *Mr. Mozee's* <u>lawyer</u> – either at the start of the Mozee trial, or at any other time. (R.R.I: 113; R.R.II: 52-53.) Thus, not only did Mr. Jackson admit that he has no recollection of providing these letters to Mr. Mozee, he also admitted that in Mr. Mozee's case (unlike Allen's), he also does not have a single item of documentation to support his assumption that he did so.

For these reasons, the district court clearly erred when she entered Findings in Mr. Mozee's case that rest upon Mr. Jackson's "meticulous trial notes." By Mr. Jackson's own admission, no such notes exist as to the discovery provided to Mr. Mozee. For that reason alone, this Court should reject the district court's Findings as to Mr. Mozee's writ.

This leaves only the well-supported Findings (agreed to by the State)

by Judge Stolz: that the letters written by Zane Smith, and the substantive discussions between Smith and the trial prosecutor referenced in this correspondence, were not disclosed to Mr. Mozee. With all due respect to Judge Hawthorne, it is troubling that the court made no mention of any portion of the extensive record before her that applies to Mr. Mozee's case, nor did she take into account the prosecutor's own admission that the very portions of the record she relied upon actually do not apply to Mr. Mozee. Combined with the fact that Judge Hawthorne entered her Findings without waiting for the transcripts or exhibits from the writ hearing to be prepared, Mr. Mozee respectfully submits that this Court should hesitate to defer to her interpretation of the record.

**II. The District Court Failed to Consider or Note that the Trial Prosecutor Admitted That He Violated His Duty to Disclose the Second (and Most Critical) of Two *Brady* Letters Written by the Lone Informant Who Testified Against Mr. Mozee**

As noted *supra*, unlike at Mr. Allen's trial (where the State relied on six different informants who had pending or recently-adjudicated criminal charges against them), only one jailhouse informant testified at Mr. Mozee's trial: Zane Arlester Smith, a County Jail inmate who claimed that Mr. Mozee made a full confession to the murder to him. Smith wrote two letters to the State regarding his allegations and testimony against Mr. Mozee, both of which were received by ADA Jackson at the time, and preserved in his trial

file.    There is no dispute that Mr. Mozee's jury never heard about either of the two letters, as no mention was made of them at Mr. Mozee's trial.

In the first letter, Smith revealed some (but not all) of the inculpatory information he claimed to have against Mr. Mozee; and even though Smith had yet to meet with a single State official regarding his proffered information, he wrote that he was "willing to testify."    This letter was written on June 28, 2000 – less than two weeks before Smith's highly favorable plea and sentence were entered in his pending theft cases (on July 11, 2000), and one month before he testified for the State at Mr. Mozee's trial. *See* Exh. 35.[3].

The second letter was written by Smith to ADA Jackson on August 2, 2000 – the day after Smith testified, and the same day Mr. Mozee was convicted.    It was in the second letter that Smith referenced earlier discussions he had with the prosecutor about assistance he believed the prosecutor would provide regarding his own conviction and sentence after he testified against Mr. Mozee.    Specifically, Smith sought confirmation that the prosecutor would, in fact, deliver on what Smith believed had been promised to him before he testified.    *See* Exh. 41 ("what I'd like to know is: Will you still be able to intercede on my behalf as you said[?]") (emphasis

---

[3] Cites to exhibits in these Objections refer to the exhibits admitted into evidence at the writ hearing held on October 26-27, 2015.

supplied); *see also* Joint MOL at 45-50 (discussing conflict with testimony, in which Smith claimed he had no prior deal, agreement, or understanding with the prosecutor regarding his own sentence, and was only "hoping" that the prosecutor "may" agree to assist him "at some point down the road").

Whether or not Smith's letter accurately reflected what Mr. Jackson promised to do for Smith in their pretrial meetings, Mr. Jackson nonetheless agreed that this second letter (like the first) was clearly *Brady/Giglio* material as to Smith. (R.R.II:76.)   Yet he admitted that he did not disclose it to Mr. Mozee's lawyer.   Specifically, Mr. Jackson testified that while he believed he disclosed this letter to Mr. Allen's lawyer (because it was written several weeks before the Allen trial), he did not give the letter to Mr. Mozee's lawyer "at any point," since Smith did not write it until the day after the Mozee verdict. *See* R.R.II: 68-69.

However, when asked about his continuing obligations under *Brady*, Mr. Jackson conceded that he would, at the very least, have a duty to disclose any such correspondence sent to him within the thirty-day period during which Mr. Mozee could still file a motion for a new trial under Tex. Rule App. Proc. 21.   (*Id.* at 106-07.)   By this time, Mr. Jackson had already admitted that there was "no question" he had not notified Mr. Mozee's lawyer about Smith's second letter (*Id.* at 69), and he did not retract

that testimony. Yet Judge Hawthorne made no mention of these significant concessions as to Mr. Mozee when she entered identical findings in both Applicants' cases.

It has never been disputed that the second letter from Smith – the *only* testifying informant in Mr. Mozee's case – is significant *Brady* material. (*Id.* at 76.) It reveals that Smith immediately sought to capitalize on what he believed was the prosecutor's promise to "intercede on [his] behalf" after he testified against Mr. Mozee (*Id.* at 67.). The significance of the letter was only further confirmed at the writ hearing, when ADA Jackson was questioned about its contents and the pretrial communications that preceded it. In direct contradiction to what Smith asserts in his letter, Mr. Jackson maintained that not only did he not promise Smith that he would "intercede on [his] behalf," but insisted that he would "never" discuss even "potential" assistance in securing a sentence reduction with Smith, or any other jailhouse informant, until after the fact:

> Q: So you are saying you would never tell somebody you would get them a – potentially get them a reduction in their sentence after they've testified?
>
> A: I would never tell them that ahead of time, that's correct.

R.R.II: 63.

Notably, Judge Hawthorne did not disturb Judge Stoltz's earlier

Finding of Fact and Law (which was also agreed to by the State) that if Smith's correspondence was not disclosed, it would be a *Brady* violation requiring habeas relief for Mr. Mozee. Instead, she simply found (without citation to the record) that Mr. Jackson "turned over the letters to defense counsel" – without, apparently, recalling that he had *admitted precisely the opposite* when he testified about Mr. Mozee's case.

For this reason alone, this Court should decline to adopt Judge Hawthorne's findings as to Mr. Mozee, as unsupported (and, indeed, directly contradicted) by the record. Instead, it should adopt the previous finding by Judge Stoltz that the letter was not disclosed – a conclusion that has only been strengthened by the former prosecutor's own testimony on remand – and grant relief on that basis alone.

III.    **The Record Also Establishes That ADA Jackson Did Not Disclose to Mr. Mozee's Counsel the First of the Two *Brady* Letters Sent by Informant Smith, and Appears to Have Misled Counsel as to the Timing and Nature of the State's Pretrial Contacts With Smith**

In focusing exclusively on the file notations pertaining to what ADA Jackson believed he provided by way of discovery on the first day of Mr. Allen's trial, the district court also neglected to consider the substantial record evidence that Mr. Jackson did not disclose to Mr. Mozee's counsel the first of the two letters sent to him by informant Smith, dated June 28,

2000 (Exhibit 35 at the writ hearing). The record evidence clearly shows that Exhibit 35 was also not disclosed to Mr. Mozee. That conclusion is supported, *inter alia*, by the fact that Mr. Jackson had no notes even arguably documenting this alleged disclosure, whereas Mr. Mozee's counsel, Matt Fry, prepared his own detailed, contemporaneous notes of his discussions with ADA Jackson regarding Smith at the start of Mr. Mozee's trial on July 31, 2000 (the date that ADA Jackson alleges he would have disclosed the letter to Mr. Fry). Defense counsel's notes make no mention of the letter, and when considered alongside Smith's testimony, it is clear that Mr. Fry was wholly unaware of the letter's contents.

Equally troubling (though not necessary for *Brady* relief, given the substantial *Brady* evidence already presented), the record also supports an inference that Mr. Jackson withheld this letter from Mr. Fry after misleading the defense about the timing and nature of his pretrial communications with Smith. This information was critical to Mr. Mozee's defense, because had it been disclosed, the jurors would surely have viewed with great skepticism Smith's claim that his highly favorable theft plea on July 11, 2000 had no connection whatsoever to his written offer to testify against Mr. Mozee that he made just two weeks earlier.

## A. Contemporaneous Record From Mozee Trial Provides No Evidence that the Letter Was Disclosed, and Substantial Evidence That it Was Not

Exhibit 35 (the "first Smith letter") was dated June 28, 2000, and was sent by Smith from the County Jail to "whom it may concern" c/o the Clerk's Office. It was forwarded to ADA Jackson, who placed it in his original trial file. (R.R.II:70-71). It read as follows:

> To Whom it may Concern:
>
> My name is Zane Smith and I am writing this statement in reguards [sic] to a homicide that happened several months ago. I am a relative of Stanley Orson Mozee and he is being charged with the Homicide case of a Dallas Preacher. I have spoken to Stanley Mozee on several occassions [sic] where he told me that he was involved in the Homicide. I am willing to testify to what Mr. Mozee stated to me.
>
> The Preacher who was killed his name is Jesse Borns Jr.
> Age: 70 yr. old.
>                                         Sincerely,
>                                         Zane Smith

Unlike the August 2, 2000 letter from Smith (Exh. 41) or the letters from Lonel Hardeman in the Allen case (Exhs. 12-13, and 18-20), this June 28th letter does not discuss the specific benefits Smith was expecting to receive in exchange for being "willing to testify." However, ADA Jackson agreed at the hearing that he was obligated to disclose this correspondence and any substantive discussions with Smith about his testimony that may have followed, both under *Brady-Giglio*, as well as pursuant to the clear

terms of an Omnibus discovery order entered weeks earlier in the Mozee case.

The pretrial discovery order is significant, because it supports both a finding of nondisclosure and confirms the resulting prejudice to Mr. Mozee. Mr. Mozee's counsel filed a comprehensive Omnibus Motion on November 30, 1999 – more than seven months before his July 31, 2000 trial began. The motion was granted by Judge Dean on June 26, 2000 (over a month before trial, and just before Smith wrote his first letter). In the Motion and Order, Mr. Mozee's counsel sought – and was granted – not only constitutionally required *Brady* disclosures, but also timely disclosure of precisely the sort of basic background information necessary to give him a fair opportunity to investigate and prepare to cross-examine jailhouse informant witnesses like Smith. This included the witnesses' prior written statements; information as to any criminal charges they may have been facing; and information regarding any assistance with those charges that the witness may expect to receive from the State. *See* R.R.I: 56-58; Exh. 8 (*State v. Mozee,* Omnibus Motion and Order, at Pt. 9) (requiring disclosure of "*any and all written statements* made or adopted by a witness who testifies"); *Id.* at Pt. 12 (State "order[ed] the State to produce, prior to trial, all criminal records of witnesses that they intend to call to the stand in the

trial of this case, and further, to determine and disclose any pending charges that the prospective witnesses may have . . . [and] whether [the State] has made, promised, or implied any promises, benefits, or concessions to any prospective witness") (emphasis supplied).

Thus, the record is clear that ADA Jackson was obliged to disclose not just Smith's June 28, 2000 correspondence, but also to provide, "prior to trial," a copy of Smith's criminal history, as well as information regarding his pending charges and his discussions with the State about potential/promised benefits to Smith.

The record demonstrates, however, that none of this information was provided to the defense before Smith testified. As with the other informant letters, Mr. Jackson agreed that he was obligated to disclose this letter to Mr. Fry. (R.R.II: 52.) He also admitted that had no recollection of doing so, but only "believe[s]" he did. (*Id.*) He further testified that it would have been his practice to make this disclosure no later than on the first morning of trial – which he would have done by pulling the letter out of his own file and showing it to Mr. Fry, and giving a copy to counsel upon request. (*Id.*) ("I would have done the same thing with [Fry] that I did with Oatman").

Unlike in the Allen case, however, the State's file <u>does not contain a single notation</u> regarding any discovery (either "physical evidence" or

documentary evidence) that Mr. Jackson allegedly showed or gave to Mr. Fry at the start of trial. Mr. Jackson searched his file for notes that may have confirmed his assumption that he gave Mr. Fry the letter, yet found none. *See* RR:53.

By contrast, Mr. Mozee's attorney did make a contemporaneous, written record of the limited information that Mr. Jackson provided to him regarding Smith on the first day of trial – which was when Mr. Jackson first disclosed Smith's identity and allegations to the defense. Mr. Fry's file notation reads:

> 7/31/00
> Prior to voir dire Rick Jackson tells me that in the last few days he has been contacted by a Zane Arlester Smith BD 04/19/65. An interview was done with Smith. Smith is D[efendant]'s cousin. He is in jail. He says he has talked to D in jail + that D tells him just what he told Inv. Berry. He also says that D told him he was going to play crazy to get off.
>
> I tell D about it. He continues to want a trial. Will not consider helping the state on the Allen case. Rick Jackson continues to be willing to use D as a witness.

Exh. 38 (emphasis supplied).

This notation clearly makes no mention of being shown or given a copy of Smith's June 28, 2000 letter. Instead, it accepts ADA Jackson's (inaccurate) representation that he was first "contacted" by Smith only "in the last few days" (*i.e.,* at the end of July).

Similarly, when ADA Jackson called Smith was called to testify at Mr. Mozee's trial the following day, he repeatedly elicited testimony from Smith that they had not even spoken about this case until after his own July 11th plea and sentence were final. *See, e.g.,* Mozee T.T. at 119 (Q: "Now, Mr. Smith, what you're telling me, *you told me that after you were already sentenced; is that right?*" A: "Yes, sir."); *Id.* at 120-21 (Q: "Are you lying to the jury hoping that I might help you?" A: "Oh, no, sir. No, sir, I'm not." Q: Okay. It's your testimony, *you told me that knowing that your sentence was already over* and that I may or may not help you out in the future?" A: "Yes, sir.") (emphasis supplied). Moreover, when Mr. Fry attempted to cross-examine Smith about his contact with the State and when it occurred in relation to his plea, he was clearly unaware of the June date on which Smith had first made his allegations. *See id.* at 1212 (Q: "And your testimony is *you were already sentenced to [365 days in the State Jail] before you ever got involved in this situation*; did I understand you to say that?" A: Yes, sir.") (emphasis supplied).

The only reasonable conclusion from this record is that ADA Jackson did not provide Mr. Fry with Smith's June 28, 2000 letter. For it is, to say the least, difficult to imagine that if Mr. Fry had been shown this letter prior to voir dire, he would not have noted it in his detailed entry regarding what

he was told about Smith on that same date.[4]

This is so for several reasons. First, Smith was the *only* informant called by the State at Mr. Mozee's trial, and Mr. Jackson waited to reveal his identity and proffered testimony until the first day of trial. As noted earlier, Mr. Fry had filed a comprehensive pretrial motion *more than seven months earlier*, on November 30, 1999, seeking discovery regarding any criminal informant witnesses – including prior written statements, their criminal histories, and information about pending charges and potential benefits from the State. Certainly, then, Mr. Fry would have had every reason to preserve a claim of a discovery/*Brady* violation and the resulting prejudice to his client in a capital murder case, by making a complete record of whatever information he was being given, at the 11th hour, about the State's only informant witness – including, at the very least, a notation that the prosecutor had shown or given him Smith's letter, had Mr. Jackson actually done so.

Second, had Mr. Fry seen the letter, he would have immediately noticed the obvious discrepancy between the date of Smith's letter (nearly five weeks before) and Mr. Jackson's representation that he was only

---

[4] Alternatively, as noted in Mr. Mozee's Amended Writ, if by some chance Mr. Fry was shown or given this letter and did not make use of it in his cross-examination of Smith, his performance was ineffective.

contacted by Smith "in the last few days." Finally, if he had seen the letter dated nearly five weeks earlier, Mr. Fry would have used it to correct the false (or, at best, highly misleading) impression left by Smith's trial testimony that there were no communications with the State about his potential testimony until after his July 11th plea and sentence were "already over."

Thus, not only did Judge Hawthorne err in entering Findings adverse to Mr. Mozee's *Brady* claim by relying solely on the prosecutor's notes from Mr. Allen's trial, which occurred several weeks later. She also failed to consider numerous aspects of the written record from the Mozee trial that directly contradict Mr. Jackson's present claim that he disclosed this letter to the defense at the start of the Mozee trial.

**B. Additional Material in ADA Jackson's Trial File Reveals That He Was Aware of Smith's Claim that Mozee Had Confessed to Him and His Offer to Testify Weeks Before Mr. Mozee's Trial Began, Yet Falsely Stated Otherwise to Defense Counsel**

Prior to the writ hearing before Judge Hawthorne, the District Attorney made ADA Jackson's original trial file available to undersigned counsel for inspection (just as ADA Jackson was given the opportunity to go through the file before testifying). During that review, counsel discovered additional material in Mr. Jackson's trial file that further demonstrates the

prejudice caused by his failure to disclose Smith's first letter. The contents of this file are compelling evidence that Mr. Jackson affirmatively misled defense counsel when he claimed, at the start of trial, that he only became aware of Smith's allegations "a few days" before trial began.

The document in question was entered at the writ hearing as Exhibit 36. *See* R.R.II: 36-37. It is an original printout of a Dallas County criminal history check on Zane Smith dated July 7, 2000, and was located in Mr. Jackson's own trial file for this case, in a subfolder he had labeled: "Zane Smith." (*Id.* at 65-66.)

When shown this document, Mr. Jackson conceded that (1) either he or someone acting at his direction ran Smith's criminal history while preparing for trial in the Mozee case, (2) the criminal history search was performed on or before July 7, 2000 (as he explained, it could have been done even earlier, and not printed out until July 7th), and thus, (3) on or before July 7, 2000 – four days before Smith's own highly favorable plea was entered -- ADA Jackson was personally "aware of the letter" that Smith had sent on June 28, 2000, in which he claimed that Mr. Mozee had confessed to him and offered to testify for the State. (R.R.II:37-39, 49.)[5]

_____

[5] Mr. Jackson admitted that Smith was a significant witness against Mr. Mozee, whom he would have wanted to interview as soon as possible after receiving Smith's June 28th letter. R.R.II:35. When asked why he told Mr. Mozee's lawyer on July 31st that he had only spoken

The discovery of this document and the above concessions by Mr. Jackson appear to foreclose the only innocent explanation for why he waited so long to inform the defense about Smith's testimony: that Smith's June 28th letter took several weeks to make its way from the clerk's office into Mr. Jackson's hands. For Mr. Jackson has now admitted that he was personally aware that Smith claimed that Mr. Mozee confessed to him, and was "willing to testify" about that allegation, at least three weeks before Mr. Mozee's trial. Yet he did not disclose this information (nor Smith's criminal history, nor the pending theft charges that were resolved by plea on July 11th – all of which were subject to mandatory pretrial disclosure per Judge Dean's order) until July 31st, on the morning of trial. Even more troubling, the record contains substantial evidence that Mr. Jackson was less than truthful with Mr. Fry when he explained the reason for the late notice, *i.e.*, by assuring Mr. Fry that he was only "contacted" by Smith "a few days" earlier.

Thus, regardless of whether this Court finds that Mr. Jackson himself played any role in securing Smith's highly favorable plea and sentence, which was entered days after Mr. Jackson learned of his availability as a

---

with Smith "in the last few days," he speculated that he might have been busy with other trials at that time. *Id.* at 50-51. Yet the State's records showed that the Mozee and Allen trials were the only ones that entire year in which Mr. Jackson was lead prosecutor; furthermore, between May and August, he only helped pick juries in two other cases. *Id.* at 138-42.

witness and ran his criminal history, the nondisclosure of this letter is significant. It clearly "undermine[s] confidence in the outcome" of Mr. Mozee's trial, *see Smith v. Cain, supra,* because (1) the State provided defense counsel with belated and inaccurate information about Smith's offer to testify, (2) deprived counsel of the timely pretrial disclosures (Smith's criminal history, current or recently-pending cases, and pretrial discussions with the State about actual or implied benefits) to which the defense was entitled under *Brady* and Judge Dean's written order, and (3) prejudiced the defense's ability to impeach Smith's false testimony as to the actual sequence of these events, *i.e.,* is claim that he did not "get involved" in Mr. Mozee's prosecution until he was "already sentenced" in his own case.

IV. **The Record Demonstrates that the Trial Prosecutor Went to Extraordinary Lengths to Reward Smith After He Testified By Procuring an Illegal Judgment and Reduced Sentence for Him, Further Impeaching His Representation to Mr. Mozee's Jury that He Had "No Deal" With Smith**

Mr. Mozee's allegation that Zane Smith testified falsely at his trial (as well as at Allen's) when he claimed to have no deal, agreement, or understanding with the State regarding a potential sentence reduction is not only supported by Smith's undisclosed letter to ADA Jackson, seeking confirmation that the prosecutor would "intercede on [Smith's] behalf" as he had promised. It is also demonstrated by the evidence developed at the writ

hearing that ADA Jackson went to extraordinary lengths to deliver on that promise.

Specifically, Mr. Jackson's efforts resulted in the entry of a highly favorable new judgment and resentencing in Smith's previously-pled theft case, leading to Smith's immediate release from custody -- even though the district judge from whom Mr. Jackson unwittingly secured this new judgment had no jurisdiction to grant this relief. Moreover, these were precisely the sort of actions that Mr. Jackson swore at the hearing he would "never" take on an informant's behalf (testimony he gave before being confronted with the original record from Smith's case fifteen years ago).

The logical and inescapable inference from this evidence is that Mr. Jackson went to such remarkable lengths for Smith in order to deliver on precisely the sort of "deal" he now denies making. For these reasons, this Court should view with great skepticism Mr. Jackson's professed confidence that he complied with *Brady* at Mr. Mozee's trial.

## A. Testimony Regarding Alleged Informant Practices

At the writ hearing, Mr. Jackson testified at length about the practices he purportedly followed in every case he handled when negotiating with jailhouse informants or other witnesses with pending criminal charges.

First, Mr. Jackson testified that he "never" told any informant that he

would provide any kind of benefit, or even discuss what sorts of things he "might" or even "potentially" do for the witness, before the witness testified. (*See, e.g.,* R.R.I: 33-34; R.R.II:64, 86). He testified that with respect to Zane Smith, this meant that (despite Smith's letter stating otherwise) he would never have discussed even the possibility of a future sentence reduction with Smith, until <u>after</u> Smith had testified in the Mozee and Allen trials. (*Id.* at 62-63.) Second, Mr. Jackson stated that if the informant's case was not in his own court, he did not get involved in providing these benefits, even after the informant testified. He stated that decision regarding post-testimony benefits would be solely up to the prosecutor handling the informant's case; Mr. Jackson would "never just go take over the case." (*Id.* at 64.) Instead, the most that he would do is speak to the other prosecutor and advise him or her that the informant had cooperated and ask for some consideration. (*Id.*; *see also* R.I.: 37: "I would go to whomever was the lead prosecutor on that case, on the witness' case, and say, look, this person came in, cooperated, testified for us, thought he told the truth, you know, I don't know whatever your recommendation is, if you can give them the benefit of that cooperation, that would be great.") He believed it was important, in his words, to "reward the behavior" of testifying informants like Smith. (R.R.II: 84, 85, 89.) But he maintained

that the most he would do was "talk to the other prosecutor about, you know, what might be fair based upon their knowledge of the [informant's] case," since he himself was not "intimately familiar with what the facts are" and thus should not decide the benefit the informant was to receive, if any. (R.R.I: 37; *see also id.* at 145 ("because I wouldn't have known the strength of their case, I wouldn't have got involved . . . I would have just told them of the person's cooperation.")

Third, Mr. Jackson testified that not only did he make clear to all of his informants and their lawyers that he would not even discuss any specific benefit they might receive in the future, but that sometimes – because of the informant's circumstances – it might turn out that he ultimately could do nothing for the witness, and that was a risk the informant had to take. *See, e.g.,* R.R.I:34 ("there have been cases where a witness has testified and there wasn't anything I could do for them and they . . . didn't get the benefit of their cooperation. There was nothing that I could change").

Mr. Jackson did not remember anything about Smith or his discussions with him regarding this case. (R.R. II: 63, 77). Other than Smith's letters, the State's file contains no notes or other record of what, if anything, they may have discussed about potential benefits in exchange for Smith's cooperation. However, he was confident that he followed his

standard practices when dealing with Smith, before and after trial. Specifically, Mr. Jackson was certain that he "did not agree prior to [Smith] testifying that I would do anything for him. (R.R.II:75.) Nor did he even tell Smith that he "might" be able to get him a reduced sentence after he testified. (R.R.II: 86). As with other informants, Mr. Jackson stated that he would have followed his "normal practice" and rewarded Smith's cooperation only by speaking with the prosecutor handling Smith's case after he testified. (*Id.* at 64) (Q: "[Y]ou would go to the prosecutor on Smith's case and tell him he helped you out, it's up to them whether they're going to do anything for him.") (A: "Correct.").

In addition, Mr. Jackson agreed that, because Smith had already pled guilty and been sentenced in his own case before he testified in the Mozee or Allen trials (with his plea entered in between the time he wrote to the State and when Mr. Mozee's trial began), he likely had little or no incentive to proceed to testify without an "offer to cut his sentence for him" – yet Mr. Jackson maintained he would never have made such an offer, nor even discussed it as a "potential[]" outcome. (*Id.* at 62-63; *see also id.* at 86 (Q: You never said I might get you a sentence reduction after you testify?") (A: I never said that.")).

### B. Benefits Given to Zane Smith

The record indicates that Mr. Jackson effectively followed none of his self-described rules for dealing with informants when it came to Smith's testimony and the actions Mr. Jackson took on Smith's behalf in the wake of that testimony.

First, it is undisputed that Smith wrote to Mr. Jackson immediately after he testified against Mr. Mozee, directly referencing the prosecutor's earlier promise to "intercede on my behalf as you said" (Exh. 41). Even assuming Jackson had not made a specific promise as to what assistance he would provide Smith, the letter clearly references at least some prior conversations between Mr. Jackson and Smith about a potential sentence reduction, which Mr. Jackson admitted was the only benefit the State could provide him at that point. Yet this was exactly the sort of pre-testimony discussion that Mr. Jackson maintained he "never" engaged in with any informant, including Smith.

Second, and more fundamentally, because of the timing of the two capital murder trials in which Smith testified for Mr. Jackson, it turned out that there was, in fact, "nothing [the State] could do" to reward his cooperation – at least, not lawfully. This is because, as Mr. Jackson acknowledged, the only way to reduce Smith's sentence after his plea was for the State to work with Smith's counsel to do an agreed motion for a new

trial. (*Id.* at 60-61.) However, Mr. Allen's trial did not conclude until September 1, 2000. (*See* Exh. 40 and R.R. II: 60-61.) By that time, 52 days had passed since the entry of Smith's judgment and sentence – meaning that the limited 30 day window in which Smith could bring such a motion had expired. (Exh. 31; R.R.II: 83-84.). Mr. Jackson did not dispute that by the time the Allen trial ended, the district court lacked jurisdiction to grant Smith a new trial or otherwise reduce his sentence. (*Id.* at 83.) Thus, Smith's was precisely the sort of situation Mr. Jackson had earlier described as a potential outcome of his "no deal" practices when it came to informants – that is, one in which he would be forced to tell Smith that there was "nothing [the State] could do" to assist him after he testified, because it was simply "too late" to reduce his sentence. (*Id.* at 86).

Yet this is not what Mr. Jackson said or did. Rather than speaking with the ADA who had prosecuted Smith, learning that the jurisdictional window to reduce his sentence had already expired, and simply informing Smith of that fact, Mr. Jackson took matters into his own hands. He personally worked with Smith's counsel to prepare and file an out-of-time Agreed Motion for a New Trial. (Exh. 42), which Mr. Jackson (not Smith's own prosecutor) signed on behalf of the State.[6]

---

[6] Mr. Jackson was asked to explain how his appearance on this Agreed Motion could possibly be

Mr. Jackson does not have any present recollection as to how the parties presented the motion to the district judge in Smith's theft case (the Hon. Karen Greene, who is now deceased) (R.R.II: 87). Nor does he recall whether he made Judge Greene aware of the fact that this was an out-of-time motion that she had no jurisdiction to grant. (*Id.*) He had no explanation as to why Judge Greene would have agreed to grant an out-of-time motion if informed of this fact, particularly since Mr. Jackson knew her to be "a stickler for the law"; his only explanation was that "she missed it somehow." (*Id.* at 88.). Mr. Jackson also could not recall any other case in his career in which he had asked a judge to ignore jurisdictional constraints in order to reward an informant (although he maintained that he "didn't invent" this remedy and that he believed other prosecutors had done it in the past). (*Id.* at 90).

The benefit to Smith from Mr. Jackson's extraordinary action on his behalf was substantial. Indeed, Smith received the maximum possible sentence reduction the State could provide – a recalculation of his 365-day State Jail sentence to 244 days in the County Jail, which he had already served. Smith had originally faced up to <u>20 years</u> in the Texas Department

---

reconciled with his earlier testimony that he would never "go take over a case" assigned to another prosecutor, and that even a motion for a new trial would only be done "at my behest" in the other prosecutor's discretion. (R.R.I: 37; R.R.II:77-79.) He had no answer except that Smith's was an "already disposed of case" in which he would spare the other prosecutor the work of providing the benefit, and conceded that his earlier testimony as to his standard practices could be fairly characterized as "true, except sometimes it's not." (*Id.* at 79-80.)

of Corrections if convicted in his enhanced felony theft cases, and his case file jacket reflects that his initial plea offer was for five years incarceration at TDC. (*Id.* at 144-45.) Within weeks of testifying for Mr. Jackson, however, Smith was freed directly from the County Jail after serving less than nine months at County, without a day of State Jail time. (RR.II: 91, 142-43).

In sum, had Mr. Jackson followed what he claimed to were his usual practices, he would have done the following: (1) had no discussions with Smith about any actual or potential benefits before he testified; (2) warned him and his lawyer that the State might not be able to do anything at all to benefit him after he testified, because of his existing plea and sentence; (3) after both the Mozee and Allen trials were over, gone and spoken with the prosecutor who handled Smith's theft case on his behalf and asked for some consideration; (4) learned that Smith's time to file a motion for a new trial – the only way to lawfully reduce his sentence – had already expired; and (5) gone back to Smith and said, "you know, Zane, there's nothing I can do, it's too late." (R.II: 86). Instead, after receiving a letter from Smith confirming their earlier agreement to "intercede on my behalf as you said," Mr. Jackson failed to disclose that letter to either defense counsel, then went to extraordinary -- and apparently illegal -- lengths to reward Smith for his cooperation.

This record powerfully impeaches Mr. Jackson's claims -- to Mr. Mozee's jury (Tr. at 119), and in his testimony below -- that he had "no deal" of any kind with Smith. It is simply inconceivable that Mr. Jackson would have personally intervened in Smith's theft case, and presented the district court with an out-of-time sentence reduction that it had no jurisdiction to grant, if he did not consider himself bound by an earlier commitment he had made to reduce Smith's sentence, whether express or implied. That he wanted to generously reward Smith for his cooperation was not surprising, since Smith was the was the only informant who testified for him at both capital murder trials. But Mr. Jackson was required to fully disclose these anticipated benefits to defense counsel, and to refrain from presenting false testimony by Smith about this issue. Because the record as a whole shows otherwise, this Court should vacate Mr. Mozee's conviction.

V.     **The Record Developed Below Also Contains Substantial Evidence of Other Violations by ADA Jackson Relating to Jailhouse Informants in This Case That the District Court Did Not Consider, but Which Strongly Support Mr. Mozee's Principal *Brady* Claim**

As discussed *supra*, ADA Jackson candidly admitted that he has no present recollection of disclosing either of informant Smith's two letters to Mr. Mozee's counsel, Matt Fry; that he did not, in fact, disclose the second letter to Mr. Fry because he received it after trial, even though he was

obligated to do so; and that he also has no file notes that support his personal belief that he disclosed the first letter (Exh. 35) to Mr. Fry. He also maintained at the writ hearing that he played no role in helping Smith secure his highly favorable plea and sentence three weeks before he testified; had "no deal" whatsoever with Smith as to what the State might do for him after he testified; and did not even tell Smith he would "potentially" help him with a sentence reduction down the road.

In essence, then, Mr. Jackson's defense to the overwhelming circumstantial evidence on record that he did not disclose either of Smith's letters, nor the underlying discussions/benefits that are reflected in them, is that he is the sort of prosecutor who followed strict rules when it came to informants, and would never commit *Brady* violations of this sort. In other words, because it was his personal practice to make such disclosures in a timely fashion and otherwise comply with *Brady*, he must have faithfully honored those obligations when it came to Smith.

Yet the record below contains substantial evidence that Mr. Jackson clearly did <u>not</u> comply with *Brady* (regarding his disclosure obligations) and *Napue* (regarding the duty to correct false statements or testimony) with regard to numerous witnesses in both the Mozee and Allen trials. Specifically, and as discussed below, the record contains new documentary

evidence that Mr. Jackson (1) was personally aware that the lead detective working with him on the Mozee and Allen cases had assisted at least two informants who testified against Mr. Allen with pending probation violations before they testified, yet failed to disclose these benefits and represented otherwise to the jury; and (2) failed to disclose that several eyewitnesses who had seen the suspect(s) in possession of the murder victim's stolen property had not identified either defendant, and/or had recanted their earlier identifications of Mr. Allen as one of the suspects. (This latter violation was just as harmful to Mr. Mozee as to Mr. Allen, because ADA Jackson knew of this exculpatory eyewitness evidence yet still presented false testimony from Det. Berry regarding the alleged identifications of Allen, and cited it as "corroboration" for Mr. Mozee's false confession.)

Even though some of these violations occurred at Mr. Allen's trial, they go directly to whether Mr. Jackson made all of the required *Brady* disclosures about Zane Smith, and did not present false testimony from Smith, in Mr. Mozee's case. Put another way, since Mr. Jackson has no recollection or record of making these disclosures to Mr. Mozee's counsel, and admits that his defense to the present *Brady* allegations rests solely on what he claims were his standard practices and integrity as a prosecutor, this Court should

certainly consider any evidence that Mr. Jackson violated *Brady* in <u>other</u> respects when prosecuting Mr. Mozee and/or his co-defendant.

Both Applicants amended their writs after the hearing to specifically plead these claims based upon the evidence presented to date, and all parties are continuing to investigate these additional *Brady* issues. Nonetheless, Mr. Jackson's answers to date, and the reports and notes in his own file, show that he repeatedly violated *Brady* and *Napue* in the course of these prosecutions.

The district court erred when she summarily found that Mr. Jackson was "credible" in his personal belief that he turned over the Smith and Hardeman letters, without addressing any of this additional *Brady* evidence, nor even giving the parties the additional hearing dates they had requested to further develop those facts. The evidence of these additional violations is summarized below, so that this Court may duly consider its significance.

A. **The Trial Prosecutor Failed to Disclose Direct Assistance Provided to Two Testifying Informants Facing Probation Violations, Despite Claiming That He Would "Never" Assist An Informant Before Trial and Would Disclose that Information If the State Had Done So**

As noted above, Mr. Jackson did not remember any of his interactions with Zane Smith before he testified, nor when they first met to discuss Smith's allegations. But he was certain that he did not assist Smith in securing his highly favorable plea and sentence on July 11th (three weeks before the Mozee

trial) -- because, Mr. Jackson testified, he "never" provided <u>any</u> pre-testimony benefits to an informant, and this would have applied to Smith. *See, e.g.,* R.R.II: 43 ("I can tell you for sure that I didn't go and intervene on anyone's behalf before they would have testified . . . . [b]ecause I never did it.") He also maintained that he never directed or authorized anyone working for him, including "a detective or an investigator," to provide a witness with any assistance whatsoever before he or she testified. (R.R.I: 66.) He clarified that he would authorize a detective to do something innocuous like "maybe give [the witness] a ride to the courthouse or something," but certainly not to assist with a pending criminal case. (*Id.*)

ADA Jackson presumed that he followed these practices in the Mozee and Allen cases. If Det. Berry had provided a witness in the Mozee or Allen cases with pre-testimony assistance in a pending criminal matter, it would have been without Mr. Jackson's knowledge and not at his behest. (*Id.* at 66-67.) He readily agreed that if Det. Berry had done so, that would be *Brady/Giglio* material. (*Id.* at 130, 133, 140.) And if not disclosed to the defense, it would be a *Brady/Giglio* violation "attributable to the prosecution," whether or not Det. Berry told Mr. Jackson about what he had done. (*Id.* at 130, 140.) He claimed it would greatly "surprise" him to learn that Det. Berry had helped any witness in these cases before they testified, and

was certain that Det. Berry "never told him" about anything like that in this case. (*Id.* at 66-67, 140.)

However, the documentary record shows that (1) Det. Berry did provide such assistance to at least two informants before they testified at the Allen trial, and (2) Mr. Jackson was fully aware of what Det. Berry had done, having recorded this information in his own pretrial notes for the Mozee and Allen cases. Yet none of it was disclosed, and it is clear from the trial record that the defense knew nothing about it.

### 1. Charles Manning

Charles Manning testified for the State at the Allen trial. At the time he testified, he was not in custody and told the jury that he was employed at a local TV news station. However, at the time Rev. Borns was killed, he had been homeless and addicted to crack, and the murder victim (Rev. Borns) had hired him for odd jobs and allowed him to stay inside his store. Manning then testified that he knew both Mr. Mozee and Mr. Allen, and that the two defendants frequently "hung out" together around that time. (*See* Allen. T.T. Vol.III: 215-18). No mention was made of any criminal charges pending against Manning, either at the time he testified or in the recent past. (*Id.*)

Although Manning provided no evidence tying Mr. Allen or Mr. Mozee to the murder, the State relied heavily on his testimony to establish an alleged

link between them. Mr. Jackson's co-counsel, ADA Eric Mountin, then went to great lengths at summation to distinguish Manning from the other testifying informants the State had presented. Unlike the informants with pending criminal problems, ADA Mountin told the jury, Manning had none, and thus had no "reason to lie" for the State:

> Remember Charles Manning? Remember the gentleman, the homeless gentleman who talked about getting his life back together? Remember how he told you what he remembered from the streets, the people he knew, the people who ran in that neighborhood? Remember one of the things that he talked about was the fact that Dennis Allen and Stanley Mozee ran together all the time. They were with each other all the time.

> Now, why would Charles Manning lie about that? And what do I mean lie about that? Well, Dennis Allen told you that he didn't even know Stanley Mozee, didn't hang with Stanley Mozee, didn't smoke crack cocaine with Stanley Mozee, had nothing to do with Stanley Mozee. And yet Charles Manning pointed out to you folks, that that was somebody that spent a lot of time together. Why would Charles Manning lie? He is probably the most credible witness of any witness in this case. Because he is the one witness that no matter what Mr. Oatman may try to paint on those other witnesses about deals that they may have made or he alleges of thinks occurred or suggests occurred, there's no deal with Charles Manning. There's no reason for Charles Manning to lie.

(Exh. 25; R.R.II: 140.)

What prosecutors did not tell the jury,[7] however, is that Manning was in fact in legal jeopardy during the entire year he cooperated with the State's

---

[7] It is unclear whether Mr. Mountin himself knew, at the time he made this argument,

investigation into the Borns homicide, including when he testified. Moreover, Det. Berry had personally intervened to keep him out of jail during that time. Manning was on probation for aggravated theft at the time Rev. Borns was killed in April 1999, and in August 1999, he was charged with violating his probation. (R.R.I: 135-36; Exh. 24.) Yet he was not remanded as a result of the violation, with the State's motion to revoke his probation passed on several times in the ensuing months. Finally, after Det. Berry intervened on his behalf (*see infra*), in January 2000 he was allowed to remain free on a personal bond pending resolution of the motion. (*Id.*). The revocation motion was still pending at the time Manning testified at the Allen trial. (*Id.*)

Mr. Jackson was fully aware of this information. At the hearing, what Judge Hawthorne would later describe as Mr. Jackson's own "meticulous notes" from his trial preparation in the Mozee and Allen cases were entered into evidence. *See* Exhs. 14-17, 50-51; R.R.I: 109. In those notes, Mr. Jackson documented the following: "Berry helped out Manning and Degraftenreed with their probation violations." (Exh. 17; R.R.I: 127) (emphasis added).

---

that Manning had a pending probation violation and that Det. Berry had intervened on his behalf as a direct result of his cooperation. But Mr. Jackson clearly did know, as reflected in his notes (*see infra*), and failed to correct Mr. Mountin's false argument to the jury.

ADA Jackson claimed to have no present recollection of Det. Berry's actions on Manning's behalf, nor did he recall whether he told the defense about it. (*Id.* at 129-30.) He swore under oath that Det. Berry "never told [me]" about any assistance provided to Manning in connection with this case. (*Id.* at 140.) However, he eventually conceded that he would not have made his file notation about Berry "help[ing] Manning and Degraftenreed with their probation violations" if someone had not told him about that assistance. (*Id.* at 137.) He also agreed that any undisclosed actions Det. Berry had taken on behalf of a witness with a pending probation violation would be a clear violation of *Brady*. (*Id.* at 130.)

Confronted with his file notes -- as well as the fact that he remained silent at Mr. Allen's trial while his co-counsel argued to the jury in summation that Manning had no pending criminal cases, and thus no "reason to lie" (*id.* at 138-39) -- Mr. Jackson proceeded to speculate that perhaps Manning's history was not disclosed because Det. Berry had helped him with a prior violation, resolved long before Manning became an informant in this case. *See, e.g., id.* at 139 ("it could have been on a previous deal"); *id.* at 134 ("if we helped him out years before then, I don't think it would" be covered by *Brady*).

However, the record squarely refutes Mr. Jackson's hypothesis (which he admitted was only speculation), for three reasons. First, Manning's own

official records, as noted above, show that he did in fact have a pending violation and motion to revoke at the time he testified in this case. Second, the assistance Det. Berry provided was documented in Mr. Jackson's own pretrial notes for the Mozee and Allen cases, further demonstrating the connection to this case (and its exculpatory value) at the time. Third, shortly after the foregoing evidence and testimony was presented at the hearing, the current District Attorney investigated the circumstances surrounding Manning's probation violation and why he was allowed to remain on bond in 1999-2000. The State's own records apparently confirmed that Manning's cooperation with the State in the Mozee/Allen cases was specifically cited by the State as a reason for the court to allow Manning to remain on bond, and that this intervention on his behalf occurred before he testified for Mr. Jackson at Allen's trial.[8]

Like Zane Smith, Manning was also immediately rewarded for his testimony. The State finally withdrew its long-pending motion to revoke his probation on September 20, 2000 – less than three weeks after Mr. Allen was convicted at the trial in which Manning testified. (*Id.*)

---

[8] *See* Supplement to Amended Applications for Writ of Habeas Corpus, filed Nov. 18, 2015 (setting forth State's post-hearing *Brady* disclosures to Applicants regarding Manning). The State has also informed the undersigned that Manning acted as a police informant on other cases besides this one, and was suffering from severe mental problems at the time of the Borns investigation. These are still further *Brady* disclosures that were not made by Mr. Jackson. *See id.*

## 2. Alvin Degraftenreed

Mr. Jackson's nondisclosure of Det. Berry's pre-testimony assistance to another witness, Alvin Degraftenreed, essentially mirrors what transpired with Manning. Degraftenreed identified Mr. Allen at trial as the taller companion of a "short" man he claimed to have seen arguing with the homicide victim on the night of the murder. (Allen T.T., Vol. 3 at 183.) At the conclusion of his testimony, Mr. Jackson asked if Degraftenreed had any "prior felony criminal record," and the witness answered affirmatively. The jury was then told that his sentence for this offense was long ago "lived out," and that the State had not assisted him for "any reason or on any subject":

> Q: [D]o you have any prior felony criminal record?
> A: Yes.
> Q: Okay. What was that?
> A: Arson.
> Q: Okay. How long ago?
> A: Oh, ten years—probably ten years.
> Q: Okay. Did you get probation or penitentiary time?
> A: I got probation
> Q: Did you live it out or did you get revoked and sent to the pen?
> A: I lived it out.
> Q: Do you have any other prior felony convictions.
> A: No.
> Q: Do you have any other theft convictions?
> A: No.
> Q: Have you asked me or have I said that I would intercede in your behalf on any reason or any subject?
> A: No.

*Id.* at 185-86; Exh. 22 (emphasis supplied).

This was incorrect. As with Manning, the record shows that Degraftenreed in fact had a pending probation violation while the Borns investigation was ongoing. Mr. Jackson was aware of that violation, as well as the fact that Det. Berry had "helped" him with the violation, recording that information in his pretrial notes. (*See* Exh. 17, 22; R.R.I: 130-32.) In fact, the State withdrew its motion to revoke Degraftenreed's probation on December 9, 1999 – between when Degraftenreed first spoke with Det. Berry about the Borns homicide in May 1999, and when he testified at Mr. Allen's trial in September 2000. (*Id.*)

When confronted with this record, Mr. Jackson initially defended himself by noting that Det. Berry "can't withdraw a motion" to revoke probation (the benefit that Degraftenreed actually received). *Id.* at 132. But he quickly conceded that Det. Berry could certainly go talk to the ADA on Degraftenreed's case about his cooperation in a pending homicide. *Id.* at 133. He further conceded that if Degraftenreed's 1999 probation violation was the one in which Det. Berry had intervened, it would be a *Brady* violation if not disclosed to the defense before Degraftenreed testified. (*Id.* at 133-34.)

\* \* \*

The evidence of the above violations regarding Manning and Degraftenreed is of great significance for Mr. Mozee, even though they did

not testify at his trial. For when it came to these two witnesses, *Mr. Jackson did precisely what he swore he would "never" do and "did not" do* with respect to Zane Smith, the informant who testified against both Mr. Mozee and Mr. Allen: (1) provide pre-testimony benefits to a witness with a pending criminal case, (2) fail to disclose any benefits he knew about, and (3) remain silent while the jury was given false information about the witness's own criminal case, and any benefits that had been given or promised.

Thus, because Mr. Jackson clearly suppressed *Brady* material and suborned false testimony at the Allen trial, this Court has all the more reason to doubt his assumption that he did not engage in such conduct at Mr. Mozee's trial. Indeed, it is even more likely that Mr. Jackson gave similar undisclosed benefits to Smith, who was a far more crucial witness for the State – he was the only informant who claimed that Mr. Mozee had "confessed" to him, and was faking symptoms of mental illness – than either Manning or Degraftenreed.

### B. The Trial Prosecutor Failed to Disclose Exculpatory Evidence Regarding Numerous Alleged Eyewitnesses

The substantial evidence of ADA Jackson's non-compliance with *Brady* and *Napue* in the Mozee and Allen cases was not limited to informant testimony. In Applicants' 2014 writs, and at the hearing below, they

offered substantial evidence that Mr. Jackson also repeatedly engaged in a pattern of such violations with respect to eyewitness testimony.

Although each of the eyewitnesses in question reportedly identified Mr. Allen (if anyone), the violations were equally if not more prejudicial to Mr. Mozee. This is because at Mr. Mozee's trial, ADA Jackson elicited highly damaging hearsay testimony from Det. Berry regarding allegedly positive identifications of Mr. Allen by three store clerks, each of whom had witnessed two suspects trying to use victim's stolen credit cards on the night of the murder. Mr. Mozee's jury was led to believe that only these three clerks "saw [the suspect] actually using the card[s]," and that each one identified Mr. Allen. (Mozee T.T. Vol., 2, pp. 208-09).[9] The State then cited this testimony as objective corroboration for Mr. Mozee's custodial confession. (*See* Mozee T.T. Vol. 4 at 92: "He says it's he and Dennis Allen. Lo and behold, Dennis Allen is the one using the credit cards, selling the pager. He's been identified.") Unbeknownst to Mr. Mozee's jury, however, none of the store clerks ever identified Mr. Allen in court – with one of them recanting his alleged identification at trial, and the State electing not to call the

---

[9]In his Amended Writ, Mr. Mozee also alleged that his trial counsel was ineffective for failing to object to this hearsay testimony by Det. Berry, rather than have the State bring the eyewitnesses to court to be examined about their alleged identifications. The prejudice from this error is clear, since none of the store clerks in fact identified Mr. Allen at his own trial. The district court entered its findings before this claim could be fully developed, despite earlier indicating that it would provide the parties an opportunity to present further testimony.

other two as witnesses. *See* Writ MOL at 54-64. Moreover, the record developed below indicates that Mr. Jackson was personally aware that several eyewitnesses did not identify Allen or Mozee or had made statements casting doubt on the accuracy of their allegedly positive identifications – yet this information was not disclosed to the defense.

### 1. Kyoung Jang

As noted in Applicants' opening writ memorandum (*see* Joint MOL at 59-60, 103-04), Mr. Jackson's trial file contained substantial impeachment information regarding the alleged identification of Mr. Allen by store clerk Kyoung Jang. According to Det. Berry, Ms. Jang was one of the clerks who identified Mr. Allen as the man who had tried to use the victim's stolen credit card in July 1999. Yet ADA Jackson did not call Ms. Jang to testify at either trial. *See id.*

Yet ADA Jackson's trial file contained an undisclosed document that appears to explain why Ms. Jang was not called as a witness: an interview of Ms. Jang by a different detective that was conducted eight weeks before Det. Berry secured this allegedly positive identification from her. In that report, Ms. Jang candidly stated that she "could not recognized [sic] anyone in relation to the attempt [sic] use of the complainant's credit card, as she had not

gotten a close look at the individual trying to use it." *See id.* at 59; Joint MOL, Exh. QQ; R.R.II: 113-14 (emphasis supplied).

At the hearing, Mr. Jackson agreed that this report was clearly exculpatory evidence that he was obligated to disclose to defense counsel. (R.R.II: 113-14.) Yet it was never mentioned at either trial, nor is the report in defense counsel's file. *See* Joint MOL at 59-60, 113-14. Mr. Jackson had no recollection of providing this report to either defendant. He also could not explain why, if he did provide it, the disclosure of this report was not mentioned in any of his detailed notes. *See id.* at 114 ("I tried to make [the notes] thorough but I'm not always perfect about it").

### 2. Roderick May

Roderick May (also referred to in certain portions of the record as "Mays") was another non-testifying eyewitness. Yet neither May's initial interview report, or any report of the photo arrays he was shown, were provided to the defendants. May's name appears in the record for the first time in the middle of Mr. Allen's trial, when Det. Berry stated, on cross-examination by Mr. Oatman, that "Roderick Mays" was one of the witnesses who reported seeing two black men trying to sell pagers near the vicinity of the Rev. Borns' store on the night of the murder (the store's pagers had been stolen).

Det. Berry then admitted he had shown May a photo lineup, but claimed he did not have the report, nor did he know where to find May:

> Q: Let's st[art] with Mays. Did you show him a photographic lineup?
> A: Yes, I did.
> Q: Where is he today?
> A: I have no idea.
> Q: "Have you looked for him?
> A: Today?
> Q: Well, could you find the report that says you showed it to Roderick Mays?
> A: I don't have that report.
> Q: You don't have it?
> A: No, I don't.

(Allen TT Vol. IV: 152-153).

The evidence presented below, however, established that (1) a copy of the initial interview report with May was in Mr. Jackson's trial file, revealing that he had given detailed descriptions of two black males attempting to sell pagers near the scene that night, and (2) with good reason, Mr. Jackson inquired, during his pretrial preparation, "Did May ever see a lineup of defendants or anyone else? Anybody know who those two B/M's were?" (R.R.II: 109; Exh. 50). In additional notes, Mr. Jackson at some point answered his own question about the results of May's photo lineup: "didn't pick anyone." (*Id.*) (emphasis supplied).[10]

---

[10] In an effort to avoid the obvious implications of this file notation, particularly in light

At the hearing, Mr. Jackson agreed that if May had been shown photo arrays of these defendants and asked whether either of them was one of the black males he saw attempting to sell pagers, "and didn't pick them out," that would be exculpatory evidence. (*Id.* at 110.) He would have been obligated to reveal that information to the defense, but he has no recollection or record of doing so. (*Id.*) And it is clear from the questions that Mr. Oatman asked Det. Berry at trial that he was wholly unaware of this information.

Thus, as with numerous other witnesses, the record developed below regarding Roderick May shows that Mr. Jackson was personally aware of exculpatory evidence (that May had seen two suspects attempting to sell the victim's property, but "didn't pick anyone" when shown the defendants' photographs) that he failed to disclose. The record further indicates that – as with Zane Smith and Lonel Hardeman – Mr. Jackson breached his duty to correct the record when a witness (here, Det. Berry) gave false or misleading testimony regarding that undisclosed exculpatory evidence.

### 3. Other Eyewitnesses

---

of Det. Berry's testimony at trial that May was shown a photo lineup, Mr. Jackson stated at the hearing that one of his investigators in the DA's Office had the first name "May," and said, "I don't know if that's her or somebody – if it's Roderick Mayes." (*Id.* at 109.) But of course, there would have been no reason for Mr. Jackson's own investigator to be viewing photo lineups of suspects in this case to see if she herself could "pick anyone." And the reference in Jackson's notes to a witness who had already described "two B/Ms" in connection with this case corresponds directly to the information in Berry's report on witness Roderick May.

Finally, Det. Berry's notes strongly suggest that there may be additional *Brady* material he failed to disclose with respect to other store-clerk witnesses. In addition to Ms. Jang, *supra*, three additional witnesses viewed two men attempting to use the victim's stolen credit card: Inson Chon, Sang Kwoon, and Sun Jung. However, none of these witnesses testified at either trial – even though Kwoon was listed in Det. Berry's reports as a witness who had allegedly made a positive identification of Mr. Allen, and even though Mr. Chon (the store manager) was the one who viewed the primary suspect most clearly and gave a detailed description to Det. Berry. *See* Joint MOL at 102-107 (discussing reports in Mr. Jackson's file for each).[11]

Mr. Jackson had no recollection as to why he did not call any of these witnesses who may have identified Mr. Allen to testify. His practice would be to interview any eyewitnesses himself before putting them on the stand. (R.R.II: 104.) He agreed that if any witness indicated to him, or anyone else working for the State, that a defendant was not the man they saw, or recanted an earlier positive ID, that would be *Brady* material; he said he would disclose it "if I knew that, yes." (R.R.II: 104-05.) In fact, Mr. Jackson's notes indicate

---

[11]Sun Jung identified another suspect – Darryl Adkins – when she viewed the array, although this fact was brought out at Mr. Allen's trial.

*Applicant Stanley Mozee's Objections to Trial Court's Supplemental Findings of Fact in Response to Remand Order - Page 62*

that he personally met with both Jang and Kwoon prior to trial (having put check marks next to their names on his "Meetings" list). *See* Exh. 17.

Regarding witness Chon (the store manager), he made a note to himself to "subpoena Chon and . . . put [him] on standby." However, elsewhere in his file, as part of his pretrial preparation, he wrote himself a note asking whether Chon had "ID['d] Defendant Allen" -- and then answered his own question, "NO." (Exh. 50.) The fact that Chon had apparently not identified Allen -- the person whom the State alleged had tried to use the Rev. Borns' credit cards at multiple locations -- was never presented to either defendant's jury. Nor did Mr. Jackson correct or qualify the highly misleading testimony given by Det. Berry at Mr. Mozee's trial the three store clerks Det. Berry interviewed during his investigation into the stolen credit cards had identified Mr. Allen.

In sum, the substantial evidence already developed below that Mr. Jackson personally knew about recanted identifications and/or "no-ID" results of photographic arrays, yet failed to disclose this to the defense or correct false and misleading testimony by Det. Berry, is still further evidence in support of Mr. Mozee's other *Brady* claims that the district court failed to consider. It is particularly troubling that the court did not consider these other violations even though its fact findings in Mr. Mozee's case were based

on nothing but the court's acceptance of Mr. Jackson's personal belief that he did not violate *Brady* (*i.e.,* by accepting his representation that he fully complied with *Brady* in every case, and thus, that he must have done so here).

### C. Trial Prosecutor's Admission that He Did Not Correct Testimony from Informant Lonel Hardeman that He Personally Knew to Be False

Last, but certainly not least, this Court should hesitate to defer to the district court's interpretation of the record and Mr. Jackson's personal belief in his compliance with *Brady,* because the court failed to consider Mr. Jackson's concession at the hearing that he in fact violated his well-established duty to correct false testimony given by informant Lonel Hardeman at Mr. Allen's trial.

The egregious falsity of Hardeman's testimony (disclaiming not just any "deal" with the State, but even any desire for assistance with the numerous felony charges pending against him) in light of his explicit letters to the contrary is clear. That portion of the record is discussed in detail in Mr. Allen's Objections to the court's findings (also filed on this same date). It bears emphasizing, however, that in addition to the documentary evidence that Hardeman repeatedly gave false testimony, ADA Jackson specifically admitted that Hardeman lied at trial. *See, e.g.,* R.R.I: 75-76 (Mr. Jackson agreeing that, when he asked Hardeman, "Have I told you that we would talk

about maybe doing something in your case when this [testimony] was over?" and Hardeman responded, "No, sir," that Hardeman was in fact "lying.") Mr. Jackson then conceded that if he did not correct this testimony (which the trial transcript shows he did not), it would be a clear *Giglio* violation on his part. (*Id.* at 76-77.)

Judge Hawthorne did not consider any aspect of either defendant's false testimony claims when she summarily found Mr. Jackson "credible" in his belief that he complied with *Brady* and *Giglio* throughout their trials – even the portion of the record in which he admitted that he allowed testimony from a key informant in this case that he knew to be false. The district court thus overlooked a critical aspect of the record that goes to the heart of the trial prosecutor's integrity and practices. As a result, this Court should exercise caution before deferring to Judge Hawthorne's review and interpretation of the record.

## CONCLUSION

WHEREFORE, Applicant respectfully requests that this Court grant his claim for relief under art. 11.07 based upon the State's failure to disclose material, exculpatory evidence; or, in the alternative, remand the case for further factual development of his *Brady* claims and the other claims in his Amended Writ application.

Respectfully submitted,

Nina Morrison
(*Appearing Pro Hac Vice*)
INNOCENCE PROJECT, INC.
40 Worth Street, Suite 701
New York, NY 10013
Telephone: (212) 364-5340
Facsimile: (212) 364-5341

Ezekiel Tyson, Jr.
Texas Bar. No. 24034715
THE TYSON LAW FIRM
342 W. Montana Ave.
Dallas, Texas 75224
Telephone: (214) 942-9000
Facsimile: (214) 942-9001

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing Objections to Trial Court's Supplemental Findings of Fact in Response to Remand Order were served on the Dallas District Attorney's Office, Attn: Patricia Cummings and Cynthia Garza, Assistant District Attorneys, by first class mail and electronic mail, on this 8th day of December, 2015.

Nina Morrison, Esq.
*Counsel for Applicant Stanley Mozee*

## CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. PROC. 73.1

Pursuant to Tex. R. App. Proc. 73.1(f), I hereby certify that the foregoing Objections comply with the word limitations of Rule 73.1(d), in that the memorandum does not exceed 15,000 words, excluding those portions exempted by the Rule. The total word count for those portions of the Memorandum covered by Rule 73.1(d) consists of 14,891 words.

Nina Morrison, Esq.
*Counsel for Applicant Stanley Mozee*